## Case No. 13,204.

SPARHAWK et al. v. DREXEL et al.

[12 N. B. R. 450;[1] 1 Wkly. Notes Cas. 560.]

Circuit Court, E. D. Pennsylvania. March 5, 1874.

PARTNERSHIP — LIEN — DEPOSITED SECURITIES — POWER TO SELL—BANKRUPTCY— ASSIGNMENT.

1. A partnership is not entitled to retain, towards the payment of its debt, the surplus arising from the securities held by one partner for his debt.

2. Where a creditor has a general lien, and the debtor. on receiving an advance or other accommodation from such creditor, deposits with him a particular security. specially intended, or appropriated, or even pledged to meet such advance, or to cover such accommodation. the security is subject not only to a particular lien for the advance or liability, but also to the creditor's general lien.

3. If two mercantile houses are composed wholly of the same persons they constitute, notwithstanding the difference in their names of association. one and the same joint party creditor, and if the creditors are entitled to a general lien and there is a deficiency in value of the securities deposited with either house, an ulterior general lien does not attach to any surplus in value of the securities deposited with the other house, except under special circumstances.

4. The difference in names implies an intended separation of possession and control, and in order to establish an ulterior general lien in favor of either house, it is only necessary to rebut this implication.

5. If the debtor knows that the two houses are composed of the same persons, and the declarations or acts of the parties pending the business, indicate a belief on each side that either house may control the securities deposited with the other house. there is a general ulterior lien, in favor of either, upon any surplus in the hands of the other.

6. A creditor who is vested with authority to sell securities deposited with him. cannot exercise it otherwise than under a trust for the debtor's benefit.

7. A creditor who holds stocks as collaterals. need not sell them by auction. but may sell them at the stock exchange or brokers' board.

8. If the debtor. though insolvent. acquiesces in a sale of stocks by a secured creditor, his assignee is bound by such acquiescence, although the stocks are sacrificed.

9. The assignee is not bound by the bankrupt's ratification or acquiescence in a sale of collaterals made after the commencement of the proceedings in bankruptcy.

10. An assignment. though voidable at the suit of the assignee, is not void.

[11. Cited in Re Pitts, 9 Fed. 544, to the point that the right of the assignee to recover property transferred in fraud of the bankrupt act can only be enforced by a suit. instituted for that purpose under section 5046 or section 5129, Rev. St.]

Charles T. Yerkes, Jr., traded as C. T. Yerkes, Jr., & Co. While thus engaged in business, he obtained a loan from S. & W. Welsh, and deposited with them certain stocks and other property as collateral security. On October 17th, 1871, Drexel & Co.

[1] [Reprinted from 12 N. B. R. 450, by permission.]

purchased the claim of S. & W. Welsh, and received the securities. Drexel & Co. sold the securities and realized enough to pay the debt and leave a balance of eight hundred and seventeen dollars and ninety-eight cents. Out of this balance they retained sixty dollars and forty-three cents, on account of a debt due by C. T. Yerkes, Jr., & Co. to them. Francis A. Drexel, Anthony J. Drexel, J. Pierpont Morgan, Joseph W. Drexel, J. N. Robinson, and J. H. Wright, were engaged as partners in the business of bankers and brokers under the firm name of Drexel & Co., in the city of Philadelphia, and under that of Drexel, Morgan & Co. in the city of New York. C. T. Yerkes, Jr., & Co. obtained loans from F. A. and A. J. Drexel, the senior members of these two mercantile houses, and deposited certain collaterals with them to secure the same. On a sale of these collaterals enough money was realized to pay these loans and leave a balance, which was retained by Drexel & Co. on account of a debt due them by C. T. Yerkes, Jr., & Co. C. T. Yerkes, Jr., & Co. also obtained loans from Drexel & Co. and Drexel, Morgan & Co., and deposited securities with each house to secure their respective loans. The collaterals for these loans were deposited with those in charge of the business of Drexel & Co.

C. T. Yerkes, Jr., & Co. failed on the 16th day of October, 1871, and was then indebted to the various parties collectively in the sum of $945,052.76, this sum being inclusive of interest to the 17th of October, 1871. A portion of this sum (inclusive of interest as aforesaid), $186,199.17, being the claim for moneys loaned by S. & W. Welsh, which was on the 17th day of October, 1871, purchased by Drexel & Co. The remaining portion of the first mentioned sum, except the sum of $2,085.00, consisted of balances of moneys which had been originally loaned by Drexel & Co., in the city of Philadelphia, amounting to the sum (inclusive of interest to October 17th) of $50,691.39, and by Drexel, Morgan & Co., in the city of New York, amounting to the sum (inclusive of interest as aforesaid) of $610,691.36, and by F. A. & A. J. Drexel, amounting to the sum (inclusive of interest as aforesaid) of $95,395.84. The loans by Drexel & Co. and Drexel, Morgan & Co. were demand loans; that by F. A. & A. J. Drexel was payable in sixty days from September 22d, 1871.

All of these loans, as before stated, were secured by pledges of various stocks and other securities. The value of those pledged for the loan originally made by S. & W. Welsh, was in excess of the amount of the sum due.

The value of the securities (as estimated by the subsequent sales made) originally pledged for the loan by Drexel & Co. (of which the sum of $50,691.39 remained due at the time of the bankrupt's failure) in the possession of Drexel & Co. at said time, ex-

ceeded the said sum by the amount of about $55,687.73. The value of the securities (according to the same estimate) remaining of those originally pledged for the loan by Drexel, Morgan & Co. (of which the sum of $610,691.36 was due) was at said time less than said sum by about the sum of $57,-205.04. The value of the securities (according to the same estimate) remaining of those originally pledged for the loan by F. A. & A. J. Drexel (of which the sum of $95,395.84 was due) at said time exceeded said sum by about the sum of $12,297.18.

On the 17th of October, 1871, C. T. Yerkes, Jr., & Co. executed the following paper, to wit:

"Philadelphia, October 17th, 1871. Drexel & Co., Drexel, Morgan & Co.—Gentlemen: You are hereby authorized to sell, at public or private sale, for cash or on credit, all stocks, bonds, and other securities you may hold which belong to me, or in which I am interested, and apply the proceeds to the payment and satisfaction of the claim you hold against me. This is to apply to the amounts heretofore advanced· or loaned to me, and also to such claims against me as you may purchase. Until sold, you will hold the securities as collateral. C. T. Yerkes, Jr., & Co."

On the 18th day of October, 1871, another paper was executed by C. T. Yerkes, Jr., & Co., which was as follows:

"C. T. Yerkes, Jr., & Co. in account current with Drexel & Co., for account of Drexel & Co., Drexel, Morgan & Co., and F. A. and A. J. Drexel.

"Please examine and report on this account as soon as convenient.

| Dr. | Cr. |
|---|---|
| To amount due Drexel, Morgan & Co. ............$505,802 19<br>To amount due F. A. and A. J. Drexel.............. 95,000 00<br>To amount due Drexel & Co..... 186,200 00 | By collaterals:<br>277 shares Green and Coates Streets Railroad stock.<br>299 shares Camden and Amboy Railroad stock.<br>100 shares New York Central and Hudson Railroad stock.<br>5,000 shares Philadelphia and Erie Railroad stock.<br>7,600 shares Lehigh Navigation Company stock.<br>1,521 shares Pennsylvania Railroad stock.<br>$3,500 United States 5-20 bonds.<br>$1,000 Oil Creek and Allegheny Railroad bond.<br>$8,100 St. Louis city gold loan.<br>$32,050 state of Pennsylvania six per cent. loan (14-25).<br>$21,000 Philadelphia and Erie Railroad seven per cent. bonds.<br>$271,900 Philadelphia city six per cent. loan. |

"Whereas, Charles T. Yerkes, Jr., & Co. have heretofore borrowed from Drexel & Co., Drexel, Morgan & Co., and F. A. and A. J. Drexel, various sums of money, at various times, and deposited with them various stocks, bonds, and other securities as collateral therefor, with the understanding and agreement that such stocks, bonds, and other securities should be held and appropriated as collateral security to and for the amounts due upon any and all of said accounts; and whereas, there are now due to said several parties, on account of such loans and dealings, the sums above mentioned, and they hold the stocks, bonds, and other securities above set out, under the agreement and understanding above mentioned, and they desire further authority to sell and dispose of the same: Now, therefore, this agreement witnesseth, that said Drexel & Co., Drexel, Morgan & Co., and F. A. and A. J. Drexel are hereby authorized to sell and dispose of the stocks, bonds, and other securities held by them, as above set out, at public or private sale, for cash or on credit, and for such prices as they can obtain therefor, and apply the proceeds, when and as realized, to the payment of above loans and advances, according to the agreement and understanding above set out. C. T. Yerkes, Jr., & Co."

On the 23d day of October, 1871, Charles T. Yerkes, Jr., made a general assignment for the benefit of his creditors. On the 10th day of November, 1871, proceedings in bankruptcy were instituted against Charles T. Yerkes, Jr., trading as C. T. Yerkes, Jr., & Co., wherein he was adjudged bankrupt on the 13th day of December, 1871; and John Sparhawk, George J. Gross, and J. Davis Duffield were appointed assignees on the 23d day of January, 1872. The assignees thereupon filed a bill in equity against S. & W. Welsh, F. A. & A. J. Drexel, Drexel & Co., and Drexel, Morgan & Co., for an account. The respondents answered, testimony was taken, and the matter referred to a master. The master made a report, to which the following exceptions were filed, to wit:

Exceptions on behalf of defendants to the report of the master: First. The master erred in finding that the defendants were not entitled to apply the securities originally pledged to secure the loan by F. A. and A. J. Drexel, to the indebtedness due to Drexel & Co. Second. The master erred in not finding that all the collaterals were held as a common security to all the loans. Third. The master erred in reporting that F. A. and A. J. Drexel should account for the surplus of the proceeds of the securities pledged for the loan by them to the bankrupt, viz.: for $4,994.14, with interest from November 19th, 1871.

Exceptions of plaintiffs to the report of the master: First. The master has erred in reporting that there was any merger of the securities of the loans made by "Drexel, Morgan & Co.," and "Drexel & Co." Second. The master has erred in not stating an account of the securities pledged for each loan separately; and in not requiring the defendants to account therefor separately. Third. The master has erred in holding that the defendants had any right to sell the securities pledged to them by S. & W. Welsh, in any

other way than at public sale by auction, after due notice. Fourth. The master has erred in holding that the defendants had any right to sell the securities, pledged to "F. A. and A. J. Drexel," "Drexel, Morgan & Co." and "Drexel & Co.," in any other way than at public sale by auction, after due notice. Fifth. The master has erred in not charging the defendants with the highest market price the securities pledged have reached since the illegal sales thereof by the defendants. Sixth. The master has erred in holding that the defendants had any right to sell the securities pledged, without notice of the time and place of sale to C. T. Yerkes or his assignee. Seventh. The master has erred in holding that the defendants had any right to buy the debt due "S. & W. Welsh," and to sell the securities pledged therefor, in the manner they did. Eighth. The master has erred in not charging the defendants with the sum of $60.43, realized from the sale of the securities pledged for the loan made of "S. & W. Welsh" and not paid over to the plaintiffs.

After the exceptions were filed, the master made a supplemental report, stating that his attention had not been called to the fact that the sum of $60.43 had been retained by Drexel & Co., and recommending that they should be directed to pay that sum to the assignees with interest from November 18, 1871. All the other facts material to this case, will be found in the opinion of the court.

Saml. Dickson and J. C. Bullitt, for defendants.

Geo. Junkin, for complainants.

CADWALADER, District Judge. The right of the complainants to the surplus values of the securities transferred by the defendants, S. & W. Welsh, to the other defendants, beyond the whole amount advanced by Messrs. Welsh to the bankrupt, has not been disputed. The other subjects of the bill have been the only matters in controversy. The two so-called houses of Drexel & Co., at Philadelphia, and Drexel, Morgan & Co., at New York, were composed each of the same six persons. They are here defendants. The bankrupt had certain transactions of distinct business with two only of these persons, namely, F. A. and A. J. Drexel. From these two he received advances, which were more than covered by deposits of distinct specific securities. The other defendants were not, in any wise, interested in these particular securities. Nevertheless, the surplus of their proceeds, after payment of the specific advances upon them, appears to have been received and retained by the six defendants. I concur with the master in opinion that they are accountable for such surplus to the complainants. I do not think that the result could, in this respect, have been changed by anything short of a positive appropriation by the bankrupt, or an agreement of equivalent effect. I believe that the defendants acquiesce in this conclusion. The subjects of the principal contention are other securities which were deposited by the bankrupt with the defendants' New York and Philadelphia houses respectively, to cover several specific advances of large amounts of money made from time to time to him by each house. The relation of the defendants to this debtor was not, at either place, that of brokers. Their principal relation, at each place, was that of his bankers. But they were not simply his bankers. The relation of banker was combined with a relation which was, in a certain legal sense, analogous to that of a factor. Independently, however, of the writings of 17th and 18th October, 1871, which will be separately considered hereafter, this analogy was a qualified one. The general relation of a simple banker to his customer, differs from that of a factor to his principal. Chief Baron Pollock, when at the bar, said in argument, that a banker is a factor for money (2 Barn. & C. 425); but one of the judges to whom the argument was addressed, said only that as to a depositor's ownership of bills remaining in the hands of his banker, the case of customer and banker resembled that of principal and factor; meaning to suggest that the resemblance was not identity—"Nullum simile est idem." Another judge said, on the same question, of the property continuing in the customer, that bankers receive bills, as factors or agents to obtain payment of them when due. The completeness or general truth of the analogy to a factor was afterwards denied in the house of lords. 2 H. L. 28, 36, 37, 43, 44. In an intervening case, bankers were judicially described by Parke, B., as "money factors" (6 Man. & G. 655), but by Lord Denham, C. J., as "a species of factors in pecuniary transactions" (Id. 666). These last expressions were used with reference to a banker's general lien. But the analogy is, in even this limited respect, an imperfect if not a false one.

The existence of a factor's general lien has been established for one hundred and twenty years, and the existence of a banker's for eighty years. They are each privileged creditors; but a factor's general lien is more extended than a banker's. The factor has, for his advances and outstanding liabilities accrued, and also for those accruing but not yet matured, a lien upon even the cash balances, which would otherwise be due and payable to his principal. A banker has no such lien upon the cash balances, which are, from time to time, to the credit of his customer. They can be drawn out for the customer's current use, upon his checks or other orders, though he may be under outstanding immature liabilities to the banker. The difference is, in this case, unimportant, because, upon securities on hand, not converted into actual cash, which alone were here in question, there is no distinction between the lien of a factor and that of a banker. Each has a general

lien upon all such securities while they are in his possession. Authorities in the United States and in England which recognize or establish a banker's general lien, are: [Bank of Metropolis v. Bank of New England] 1 How. [42 U. S.] 234, 239; [Bank of Metropolis v. Bank of New England] 6 How. [47 U. S.] 212; [Bein v. Heath] Id. 229; Sweeney v. Easter, 1 Wall. [68 U. S.] 166; 1 Esp. 67; 5 Durn. & E. [5 Term R.] 491; 15 East, 428; Ryan & M. 271; 12 Clark & F. 805, 806, 810; same case in house of lords, 3 C. B. 531, 532, 535, and in exchequer chamber [6 Man. & G.] 660, 664–666; 8 Ch. App. 41; L. R. 17 Eq. 235, 236. Where a creditor is in a privileged relation, which thus gives him a general lien, and the debtor, on receiving an advance or other accommodation from such creditor, deposits with him a particular security, specially intended or appropriated, or even pledged to meet such advance, or to cover such accommodation, the security is subject not only to a particular lien for the advance or liability, but also to the creditor's general lien. This general lien is a right of retention, which attaches at once. and becomes ultimately available for his benefit, if there is a surplus of the value of the particular security and such surplus is needed in order to cover any deficiencies. If each of the defendants' houses were considered here as a distinct joint party creditor, the lien of each house would thus have been a general one upon all securities deposited by the debtor, with such house. That the defendants had, at each of the two places at which they conducted their business, a general lien to this extent, is unquestionable. The questions to be considered are not as to a general lien of so simple a kind.

The first question will be, whether for any deficiency in value of the securities deposited with either house, an ulterior general lien attached to any surplus in value of the securities deposited with the other house. Composed, as these two houses were, wholly of the same persons, they constituted, notwithstanding the difference in their names of association, one and the same joint party creditor of the bankrupt, or debtor to him. Their accounts with him could, at any time, have been consolidated, in order to ascertain the general balance of all his transactions with them, in both names; and the final balance of all accounts, whether against him, or in his favor, could have been sued for in a single action. These propositions do not suffice to establish the existence of the indiscriminate ulterior general lien, which is now in question. To assume that such a lien upon all the securities, as a common fund, must necessarily attach, as a consequence of the consolidated right of action, would be a mere begging of the question. But the propositions may elucidate it.

Lord Kenyon, the judge who first recognized the general lien of a banker, said that it existed by the general law of the land, unless there was evidence to show that the banker had received any particular security, under special circumstances, which would take it out of the general rule. 5 Durn. & E. [5 Term R.] 491. From the case of Brandao v. Barnett, if the judgment of the court of exchequer chamber (6 Man. & G. 630), and the judgment of reversal in the house of lords (3 C. B. 519; 12 Clark & F. 787), are compared with each other and with Leese v. Martin, L. R. 17 Eq. 224, it will appear that the special circumstances which will prevent the attaching of the general lien, must be such as are incompatible with its intended existence or continuance. Here it may be observed that if the name of the two houses had, in each place, been the same, the mere fact that two or more distinct accounts, differently described or entitled, were kept by them with this customer, would not have prevented the ulterior general lien from attaching. The accounts might, at any time, have been consolidated for the purposes of such ulterior lien. Indeed, the lien would have attached without any actual written consolidation of accounts. The separation of the accounts could have no more operation to the contrary than a specific appropriation of a certain security to meet a particular advance, which is the ordinary case of the general lien attaching to any surplus. The reason is, indeed, stronger than in such ordinary case. The balance of one account being against the defendants, and the balance of the other being in their favor to a greater amount, the general lien would have secured the excess of the latter balance above the former one.

In the case of In re European Bank, the judges of the English court of chancery appeals were of opinion that, "as between banker and customer, whatever number of accounts are kept in the books, the whole is really but one account, and it is not open to the customer, in the absence of some special contract, to say that the securities which he deposits are only applicable to one account." In that case, a debtor bank had three accounts with a creditor bank, which were kept by the latter bank; namely, a loan account, a discount account, and a general account; and was in the habit of receiving, from the creditor bank, accommodation loans, which were entered in the loan account, and of transmitting securities, by way of deposits, to meet these loans. In the course of these transactions, the debtor bank thus transmitted three bills of exchange to the creditor bank in a letter, stating that they proposed to draw upon the latter bank for a greater amount, but that, as their credit would not afford a margin to that extent, they sent the three bills as a collateral security. The drafts for the larger amount were paid by the creditor bank, and the payments charged to the loan account. The avails of the three bills were more than sufficient to cover this loan account; but there was a deficiency, which remained due, on the general account. The decision was that, for this deficiency, the creditor bank had a lien

upon the three bills so far as they were not required to cover any balance of the loan account, though securities thus deposited had never before been applied, as between the two banks, to any balance or accruing liability in either of the other accounts. 8 Ch. App. 41. But, in the present case, the difference was not thus merely in the heading or title of two accounts kept by a banking-house with an indebted customer. The difference was also in the names, under which the defendants carried on their own business at the different places, and in which the respective accounts with him were kept, and the several securities were originally deposited and received. Did this additional difference exclude the ulterior general lien?

Independently of special circumstances, which are to be considered hereafter, I would have thought that it did. It is true that such a private association as an unincorporated banking-house, or a commercial firm, is incapable of any artificial aggregate existence, independent of the natural personality of the members. Their internal and external relations, in this respect, cannot be conventionally modified where any question of continuing succession is involved, or any question of a right of action, or of any established form or mode of judicial procedure. But where no such question, either of representative existence or of judicial personality, is involved, the internal and external relations of the association may, within certain limits, be so determined conventionally as to resemble those which might be contracted by an artificial aggregate person, such as a corporate body. As to the internal concerns of a partnership, we know that their books ordinarily contain debits and credits to each member in account with his firm, in the same form as if he were the stockholder of a corporation; and cases have occurred in which such entries, and those of a different kind, have been judicially contrasted in determining the question whether a debt is joint or several. As to external relations, the illustration is more simple. The business may be conducted at different places in the distinct names of two or more branches or firms, which are nominally different, though, in fact, composed, as in the present case, of the same persons. Now, with reference to such nominally different personalities, liens may, conformably to the laws of property, be conventionally created or extended, excluded or restricted. And this may be done either expressly or by implication. In considering the effect of the difference in the names, it may be observed that no lien can exist in favor of a creditor who has not possession of the subject. It is true that a controlling power is in effect possession, and that the requisite control might conventionally have been given, notwithstanding the difference in the names of the two houses. But this difference in their names might well be understood as implying, unless otherwise explained, an in-

tended separation of possession and control. This would exclude the ulterior lien in question. If an association, composed of the same persons, carries on business in Asia, America, Europe, and Africa, under four different names, the intended separation might, perhaps, in many cases, be almost a simple inference of common sense. On this point I may have overlooked some authority which ought to have been mentioned. In some cases which I have read there might be a supposed analogy; but it fails of applicability to the question. In Haille v. Smith, 1 Bos. & P. 563, the existence of such an ulterior lien was not suggested; but there was an express appropriation, which made the question immaterial. The appropriation would not have been thought necessary if the lien existed. But I have not attributed to the case any bearing upon the question. The rule upon the subject should be sufficiently uniform to be adaptable to the probable cases of most frequent occurrence; and where the names at different places differ, a shifting lien, transposable from one place to the other, could not ordinarily be sustained without practical inconvenience. To avoid injurious uncertainty, the safer rule would seem to be, that even where the same persons conduct their business in the same town under different names, an intended exclusion of the ulterior general lien is ordinarily implied.

Therefore, independently of the special circumstances, I would be of opinion that the defendants had no lien upon a surplus in the hands of one of their houses to cover any deficiency in the securities deposited with their other house. The great fire of the 8th and 9th of October, 1871, at Chicago, caused a sudden depression of the market or nominal value of the securities. The bankrupt, on the 16th of that month, failed in his business, which had been that of a banker and stock and exchange broker. The securities in question were such as he had been in the habit of buying and selling as a broker, and as a speculator on his own account. Until after the fire, no special circumstances had occurred in any wise changing the general aspect of the legal question above stated. The business had theretofore been conducted very loosely on the part of the defendants, but without any apparent irregularity on the part of the bankrupt. The defendants had kept no accounts with him which were entered in their books at either New York or Philadelphia. They had only memoranda of the loans on slips of paper accompanying the securities. The specific securities were, until then, kept separately by, or for, the respective houses. In the bankrupt's books there was always a formal separate account of each house with him, and appended was always a list of the securities. This list was kept by him in such a manner as to indicate the securities which each house had originally received, and what securities were,

at any given time, on deposit, with them respectively.

The occurrences in the week next following the fire were important. On the 10th of October, 1871, or perhaps a day or two later, the defendants made a verbal demand upon this debtor to pay off their loans to him as fast as he possibly could. He assented or submitted. They appear to have been willing that, in order to raise the money, he should himself sell the collateral securities which they held. This demand was made at Philadelphia, by two of the defendants, on behalf either of both houses or of their New York house. One of the defendants testifies that the call for payment was more positive, but that on the result of the interview the positive call was withdrawn. Being pressed to give the language used, he answered, "The language it is impossible for me to recollect further than one point * * * in regard to Drexel, Morgan & Co.'s loan. Upon referring him (the debtor) to them for renewal, his reply was, 'There is no need, it is all one concern, and you can fix it as well as they.' That, to my recollection, is about the words used, and we arranged it accordingly, without reference to them. * * * That is about as much as I can recollect of the actual words, except the agreement to continue the loan.' That is not part of the words. * * * There was no change made in the entries, but the collaterals were consolidated." Being asked to explain this expression, he added:—"Previous to that time, the line of distinction had been attempted, in keeping collaterals of Drexel & Co. and Drexel, Morgan & Co.,—that is to say, though in the same receptacle, they were kept separate, probably by a band. Afterwards there was no separation." Recurring to the interview, he said, "I merely continued the loan; extended the time of its payment by making it on demand," and said further, that this was done without any reference whatever to Drexel, Morgan & Co. by Drexel & Co. Another of the defendants and the debtor, concurred in attributing to what passed in the same interview, the effect, as between the defendants' two houses, of an assumption by the Philadelphia house of a responsibility to the New York house for the whole amount of the loans; and the debtor assumed in his testimony, that the business thereafter was between him and the Philadelphia house alone. But this was a mere arbitrary version; and the assumption was unsupported by any written or oral proof. The debtor's testimony on this point, where not indistinct, is, like that of the defendants, merely argumentative. He and they, by constantly introducing alleged mental understandings and asserted usages, have so confused and obscured their testimony, that, independently of certain acts, which will next be mentioned, it would be of no effect.

From the master's report it appears that, in the interval of a week or less between this interview and the debtor's failure, "the physical separation of the collaterals by means of envelopes or gum bands was entirely dispensed with, and they were mingled together in a common receptacle." It further appears that the loan by the Philadelphia house, which amounted, on the 9th of October, 1871, to two hundred and thirty-two thousand dollars, was reduced by the payment of forty-seven thousand dollars on the 12th of that month, when six hundred and fifty-three shares of stock of the Pennsylvania Railroad Company, pledged originally for the loan by the New York house, were taken away by the debtor. The balance due to the Philadelphia house was further reduced by a payment of fifty-six thousand dollars on the next following day, when five hundred shares of the stock of the same company and twenty-eight thousand dollars of the six per cent. loan of the city of Philadelphia, both likewise originally pledged to the New York house, were taken away by him. The payments of these two amounts, together one hundred and three thousand dollars, thus made by the debtor to the Philadelphia house, appear, by their memoranda and by his books, to have been appropriated by him and them in reduction of his debt to them. The master states that a further reduction of the debt to the Philadelphia house was made by a like payment of eighteen thousand six hundred and forty-five dollars, on the 16th of the same month, when about three hundred and thirty-four shares of stock of the Pennsylvania Railroad Company were taken away by the debtor from those which had been originally pledged for the loan by the New York house. This payment, according to the master's report, was credited by the defendants on their memorandum as made on account of the debt to the Philadelphia house, but does not appear to have been so entered on the books of the debtor. If all the members of the two houses had not been the same persons, every one of these appropriations would have been a conversion of securities of the New York house to the use of the Philadelphia house; and every such conversion would have been a fraud upon any non-assenting member of the New York firm, who was not also one of the Philadelphia firm. In that case, restitution of the securities, or of their value, would have been compellable under proceedings in equity at the suit of the non-assenting party. It appears from the master's report, that if such restitution had been made, there would not ultimately have been any deficiency in the value of the securities to cover the whole amount of the loans made by both houses. Now, it might be suggested that although the two houses were composed of the same persons, and therefore no such adversary relation could arise, yet the only reason for excluding them as a single joint creditor from an indiscriminate general lien upon all the securities, considered as a common fund, depends upon the implied conventional analogy

to firms not composed wholly of the same persons, and that we should adhere to this analogy in all its consequences. If the suggestion were fully admitted, it might be supposed to follow that the New York house was equitably subrogated for the Philadelphia house, to the extent in value of the securities diverted by the latter house from their original appropriation. A confused notion of such a right of substitution seems to have been in the mind of one of the defendants while under examination as a witness.

I have not, however, been able to conceive a practical definition of any cognizable equity so founded upon the suggestion as would be applicable to the present case, independently of the question of express or tacit convention. The case must therefore be considered upon the latter question alone. Here the question differs very materially from what it would have been if the persons composing the two houses had not been wholly the same. If there had been a member of either house of the defendants who was not a member of their other house, the two houses or firms would have had separate rights of action against the bankrupt, which could not have been consolidated. Each firm would then have had its own general lien upon the securities deposited with such firm. This lien would have attached for the specific advances and also for the general balance of account of such firm. But to establish an ulterior right of either firm, if thus composed of different members, to retain a surplus in value of securities in order to cover a deficiency in the value of those deposited with the other firm, some positive act of appropriation, or equivalent agreement, would be necessary. Lord Eldon said that "understanding alone, unless in a fair sense amounting to agreement, would not do." 2 Ves. & B. 84. I think that the present evidence would not suffice for the purpose in such a case. Composed, however, as the two houses were in the present case, of the same persons, the question is merely one of rebutting an implication. If the names of the houses had been the same, the ulterior general lien would have attached. The implication of a conventional exclusion of such a lien would arise only from the difference in their names. The question is, whether the special circumstances which have been proved suffice to rebut this conventional implication. In the mere constitution of the two houses, there was nothing whatever incompatible with as extended a lien as if their names had been the same. It is true that, on the question of rebutting the implication, the remark of Lord Eldon applies to a certain extent; but its application is narrowed, because the question is both a different and a more limited one. A mere mental purpose or intention, such as the defendants, in their answer, call an understanding, is no criterion of right. See [Bank v. Kennedy] 17 Wall. [84 U. S.] 20, head note, pl. 8, and pages 28, 29. Testimony of such simple belief or understanding is in-

admissible. This rule, which has always been observed, has acquired great practical importance since parties litigant have been examinable as witnesses.

The proper inquiry is, whether the declarations or acts of the parties in the interval which has been mentioned sufficiently indicated that the securities were conventionally commingled, so that they could be shifted at the option of the defendants from one of their houses to the other. I cannot attribute such an effect to the simple fact that the debtor knew the two creditor houses to be composed of the same persons. The intention to separate the possession and control might, with reason, be attributable, notwithstanding such knowledge. But where such knowledge exists, and the declarations or acts of the parties, pending the business, indicate a belief upon each side that either house may control the securities deposited with the other house, the case becomes, in principle, the same as if their business had been conducted at each place in the same name. In that case, if they had kept two distinct accounts with the debtor, this fact would, as we have seen, have been immaterial. We have no sufficient knowledge of any such declarations of the parties in the interview which has been mentioned as can be judicially acted upon. But their subsequent acts directly negative any continuing intended apportionment of the lien, and indicate that, after the interview, all the securities were blended as a common fund, which was treated as the subject of an indiscriminate general lien of the two houses. It is immaterial whether such acts determine the effect of what may, in the previous conversation, have been agreed upon, or constitute independent proof in themselves of a blending of the securities in a common fund. In either view of the subject the effect is the same. The indiscriminate or ulterior lien may, therefore, be considered as having attached to all the securities at each place, notwithstanding the difference in the names of the two houses. This indiscriminate lien attached before the failure of the bankrupt on the 16th of October, and before the defendants had reason to believe that his failure was impending. Had this been otherwise, the bankrupt law would have prevented their agreement with him, made immediately after his failure, from taking effect for their benefit. But inasmuch as their prior lien continued, this agreement was neither actually nor constructively in fraud of the bankrupt law. The agreement is, therefore, available to the extent of placing them on the same legal and equitable footing as if the securities had been originally received by them under a contract enabling them to make sales in such manner as the agreement authorizes.

But such a contract, so far as it enables creditors to extinguish their debtor's right of redemption by a sale, must, like all contracts affecting equities of redemption, be construed benignantly for the debtor,—as benig-

nantly for him as may consist with security of the creditors. It is not necessary to consider how far an agreement enabling them to sacrifice the securities would, if made at such a crisis of insolvency, have contravened the bankrupt law. The inquiry may be dispensed with, because, if bankruptcy had not occurred, the rule of interpretation of the contract would exclude any such unreasonable extension of the power. How far, and on what conditions, if no such posterior agreement had been made, and no prior express authority to sell had been conferred, the defendants might have sold the securities on default of payment by the debtor, is likewise an unnecessary inquiry. The posterior contract has the same effect as if a reasonable authority of the kind had been conferred when the securities were deposited. It is an authority to sell them at public or private sale for cash or on credit, and, as I think, to sell before or after the maturity of the respective advances. But creditors in whom such an authority is vested cannot exercise it otherwise than under a trust for the debtor's benefit as well as their own. They are not to frustrate any just expectations of a surplus by forcing sales for barely enough money to secure themselves. There was thus a trust vested in the defendants for the residuary benefit of the bankrupt and of his estate. And the only remaining question is whether this part of their trust has been duly executed.

The question may be considered as to the mode and as to the times of sale. As to the mode, I am not aware of any reason that the sales should have been by auction. On the contrary, I think that, considering the nature of the securities, this would not have been an advantageous mode of disposing of them if there was a fair market for them at the stock exchange or brokers' board, where the ruling prices ordinarily fix the standard value, from time to time, of such securities. If the times of sale were proper, this mode was unobjectionable. The dates of the sales have not been precisely ascertained. An account with the bankrupt on the defendants' books was opened by them, for the first time, on the 23d of October, 1871, a week after his failure. The first entries in this account are dated on the 17th of October, 1871, the day next after his failure, charging him with several hundred thousand dollars. According to this account, sales of the securities to a very large amount were made at several times before the 24th of that month; other sales were made on the 25th of October and on the 3d of November; others on the 6th, 7th, and 9th of November; and the remaining sales, netting a large amount, on the 18th of November, 1871. One of the defendants testifies, however, that the last sales were made, as he thinks, on the 9th, or it might have been on the 7th, of November, the credits under date of the 18th of that month "being receipts arising from sales made at an earlier date, and prior to the 9th." He adds:—"The city sixes delivered on the 18th of November had been sold shortly subsequent to Mr. Yerkes's failure; but, in consequence of the refusal of the city comptroller to countersign, we were not able to deliver to the parties until the 18th." The possible importance of this discrepancy will be seen hereafter. There is no reason whatever to doubt that all the sales were made at the highest market rates obtainable at the respective times of sale. The only question is whether the sales were unduly precipitated. Another of the defendants testifies as follows:—"We could have sold out the stocks at once and paid the debt had we been disposed to have done so; but we preferred having Mr. Yerkes nurse his stocks along so as to get more for them, and meet the market gradually,—in other words, we did not want to slaughter his stocks." That the witness was mistaken as to the existence of a rightful power to sacrifice them, would be unimportant if they were not in fact sacrificed. He further testifies thus: "A large portion of these stocks were sold on time, in order that a better price could be obtained than a cash sale—a forced sale. If I had not had that judgment that the market was going down further, I could have kept those stocks instead of selling them, and possibly have produced more money, because the market went up afterwards. My idea was that the Chicago fire had destroyed about two hundred millions of dollars, and I could not see any future for speculative stocks. Question.— What was the character of the stocks? Answer.—We had Philadelphia and Erie, Lehigh, Pennsylvania Railroad; most of them were speculative stocks and non-dividend-paying stocks. The Pennsylvania Railroad stock, I thought, would decline from the interruption of the trade with Chicago and the Great West. Had I held similar stocks, even without need of money I should have sold." That a sudden depression of prices, caused by an extraordinary fire, would, in a country like ours, be permanent, or that they would probably fall still lower from the same local cause, was a somewhat arbitrary theory. The sales in question were in fact made on a rising market, and they were made for not more than just about enough to cover the debt. If there had been a little further delay, there would have been a surplus from a rise in prices, which would not have been properly called speculative. If the stocks were rightly described by him as speculative, the course pursued was not the less disastrous. In the absence of ratification, express or implied, I would pause long before deciding that the sales were such as would have been made by a prudent owner of the securities in order to raise, within a reasonable time, from the sale of them, a fair surplus above the amount of the defendants' advances. There would

seem to have been no thought of a prospective surplus in value.

But if this were a right statement of the question, it could not be decided without considering another question. It is that of ratification or acquiescence. The assignment to the complainants gave them, for general purposes, a title, by relation to the commencement of the proceedings in bankruptcy on the 10th of November, 1871. On 24th of October, 1871, the bankrupt had made a voluntary general assignment for the equal benefit of his creditors. That assignment was recorded on 4th November, 1871. Though voidable, and afterwards avoided at the suit of the complainants, it was not, in the meantime, void.

I fully concur with the master in opinion that the mere insolvency of the debtor, before his voluntary assignment, did not supersede or affect his residuary ownership of the securities which were subject to the defendants' advances. The defendants must have been aware of the precariousness of this ownership. But while it continued, they were not the less entitled to any benefit derivable from it. Now, it is distinctly proved that if the sales were not made through his own agency, he was fully apprised of and acquiesced in all of them. It is true that he seems to have supposed himself at the mercy, in this respect, of the defendants. But I cannot discover anything 'n the evidence, before his voluntary assignment, which diminishes the legal or equitable effect of his ratification or concurrence, I think that the complainants, therefore, cannot have any relief as to the sales made before the 24th of October, 1871. But the mistakes in law of these parties may affect the question as to subsequent sales. As to the sales made between the 24th of October and the 10th of November, 1871, I am not quite sure that the complainants are bound to prove notice of the voluntary assignment. I do not think it clear upon the evidence that none of the defendants knew of this assignment. There seems to be some reason to believe, though there is perhaps no distinct proof on the subject, that the voluntary assignee, in relation to all the securities unsold at the date of the assignment to him, confided the execution of the trust to the bankrupt, who was formally or informally that issignee's agent as to these dependencies. It might not, in an ordinary case, have been culpably unsafe to rely thus upon the judgment of the bankrupt where his experience must have been greater than that of the assignee. But the truth may, perhaps, be that the assignee gave himself no concern whatever about the matter. If so, as he would, upon inquiry, have learned that the bankrupt had incorrect notions of the powers and rights of the defendants, the interests of the general creditors were not properly guarded. This part of the case, perhaps, requires further development. If any sales were made after the 10th of November, no ratification of, or acquiescence in them, can be imputable to the complainants. But it may be questionable whether the title of the voluntary assignee was abrogated from that date, and may also be doubtful whether all the sales were not made before it.

The case may be argued before a full court. If a further reference to the master shall become necessary, definite instructions to him will probably be given.

NOTE. The case was subsequently argued before the circuit court, and the exceptions were dismissed and a decree made in accordance with the master's report; the costs to be paid by the defendants. No additional opinion was delivered.